MARONEL BARAJAS (SBN 242044)
  MB@barajasriveralaw.com
ANNA RIVERA (SBN 239601)
  AR@barajasriveralaw.com
**BARAJAS & RIVERA, APC**
1440 N. Harbor Blvd., Ste 900
Fullerton, CA 92385
Tel./Fax: (714) 443-0096

*Attorneys for Plaintiff M.C.*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.C., by and through her guardian ad litem JEANINNE CAVAZOS,<br><br>              Plaintiff,<br><br>vs.<br><br>KERN HIGH SCHOOL DISTRICT, MICHAEL ZULFA, in his official capacity as Superintendent of Kern High School District, and DOES 1-10, Inclusive<br><br>              Defendants | Case No. |

Case No.

**COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES FOR VIOLATIONS OF:**

1. Americans with Disabilities Act (42 U.S.C. §§ 12132, *et seq.*);
2. Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §§ 794, *et seq.*);
3. Cal. Gov't Code §§ 11135, *et seq.*;
4. Contract Law / California Civil Code §1668 and 3513
5. Cal. Educ. Code §§ 200, 201, 220 and 260;
6. Cal. Govt. Code §815.6 *et seq.*;
7. Negligence and Negligence *Per Se*;
8. Negligent Supervision;

**DEMAND FOR JURY TRIAL**

Plaintiff M.C.[1], a minor ("M.C." or "Plaintiff"), by and through her Guardian *Ad Litem* Jeaninne Cavazos, brings this action for declaratory and injunctive relief and damages against Defendants Kern High School District (the "District"), Dr. Michael Zulfa, Superintendent of Kern High School District ("Zulfa") and Does 1 through 10, inclusive ("Does") (collectively "Defendants"), and alleges as follows:

## **INTRODUCTION**

1. This is an action for damages and declaratory and injunctive relief brought under, *inter alia*, state and federal disability rights laws to redress systemic civil rights violations against Plaintiff, M.C., a 14-year-old student who has multiple disabilities, including epilepsy.

2. Epilepsy is the most common childhood brain disorder in the United States, impacting 470,000 children and adolescents aged 0-17 years.[2] Epilepsy is also commonly known as seizure disorder. Historically, people with epilepsy were perceived as possessed, evil or contagious.[3] Until 1970 it was still legal to deny people with seizures access to restaurants, theaters and other public places.[4]

3. In a school with 1,0000 students, about 6-students would have epilepsy.[5] Centers for Disease Control and Prevention Data showed that students with epilepsy, aged 6-17 years, were more likely to miss 11 or more days of school, which is more missed days compared to students who have other health issues.[6]

//

---

[1] M.C. is referred to by her initials pursuant to Federal Rule of Civil Procedure 5.2(a)(3).
[2] American Academy of Pediatrics, https://www.aap.org/en/patient-care/epilepsy/#:~:text=Epilepsy%20is%20the%20most%20common,a%20person%20has%20recurring%20seizures (last visited April 13, 2025).
[3] *The History and Stigma of Epilepsy,* Epilepsia, (August 18, 2003), (h*ttps*://onlinelibrary.wiley.com/doi/epdf/10.1046/j.1528-1157.44.s.6.2.x. (last visited April 13, 2025).
[4] *Id.*
[5] Centers for Disease Control and Prevention, *Managing Health Conditions in School*, https://www.cdc.gov/school-health-conditions/chronic/epilepsy.html?CDC_AAref_Val=https://www.cdc.gov/healthyschools/npao/epilepsy.htm  (last visited April 13, 2025).
[6] *Id.*

4.  The Americans with Disabilities Act ("ADA") was enacted nearly thirty-five years ago, establishing the most important and comprehensive civil rights law for people with disabilities in our nation's history. One of the principal goals of the ADA is the integration of people with disabilities into all aspects of social life, including schools. *See* 42 U.S.C. §12101(a). Prior to the enactment of the ADA, Section 504 of the Rehabilitation Act of 1973 ("Section 504) mandated similar goals for recipients of federal financial assistance. *See* 29 U.S.C. § 794.

5.  Despite these long-standing mandates, Defendants have, *inter alia*, intentionally discriminated against M.C. on the basis of her disability by, among other things: initially refusing to administer Ativan, her prescribed lifesaving rescue antiseizure medication at school; requiring her parents to rush to school to administer the Ativan; refusing to permit her to carry Valtoco, her other prescribed lifesaving rescue antiseizure treatment medication; treating her differently than her non-disabled peers; adopting and/or implementing discriminatory policies, practices, and procedures regarding the administration of medication at school or during school activities, including requiring that Plaintiff sign a release of liability with indemnification before Defendants would administer her medication; requiring its staff to call 911 every time that it administered Valtoco as well refusing to permit her to remain at school after calling 911 even if she had fully recovered; initially failing to properly use Plaintiff's Vagus Nerve Stimulator (VNS)[7]; and failure to sufficiently train and supervise District staff regarding administration of medication at school. Further, Defendants have failed to*, inter alia*, provide M.C. with reasonable accommodations to address her disabilities that would allow her

---

[7] A VNS device is a pacemaker-like device designed to prevent seizures by sending regular impulses of electrical energy to the brain via the vagus nerve. *See*, Epilepsy Foundation, *Vagus Berve Stipulation (VNS) Therapy*, https://www.epilepsy.com/treatment/devices/vagus-nerve-stimulation-therapy (last visited on April 10, 2025). Holding a special magnet near the implanted device triggers it to deliver extra stimulation which can help stop seizures. *Id.* When M.C. is able, she can swipe the magnet herself; in other instances, the magnet can be used by family members, friends or caregivers.

meaningful access to the District's programs, services, and activities, and otherwise not exclude her from its educational program and have failed to keep her safe. In so doing, Defendants have violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*., Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794 *et seq*., state civil rights laws, and common law torts.

6.    The United States Supreme Court has explained the significance of public education:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

*Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan*., 347 U.S. 483, 493, 74 S. Ct. 686, 691, 98 L. Ed. 873 (1954), supplemented sub nom. *Brown v. Bd. of Educ. of Topeka, Kan.,* 349 U.S. 294, 75 S. Ct. 753, 99 L. Ed. 1083 (1955)

7.    As a result of the Defendants' discriminatory acts and omissions, Plaintiff has suffered, and will continue to suffer emotional distress and humiliation, and has been, and will continue to be denied full and equal access to Defendants' services, programs and activities.

8.    Through this lawsuit, Plaintiff seeks, *inter alia*, compensation for her injuries, declaratory relief, and an injunction requiring Defendants make reasonable accommodations for students with disabilities who require medication

administration as required by law.

## JURISDICTION AND VENUE

9.   This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. The same actions and omissions that form the basis of Plaintiff's federal claims, form the basis of his California state law claims. Thus, this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Declaratory relief is available pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by 28 U.S.C. § 2202 and Rule 65 of the Federal Rules of Civil Procedure.

10.  Venue is proper in the Eastern District of California because Plaintiff resides in, and Defendants operate and perform official duties in, the Eastern District of California. A substantial part of the events, acts, and omissions giving rise to the claims also occurred in the Eastern District of California. 28 U.S.C. § 1391(b).

## PARTIES

### *Plaintiff*

11.  M.C. is a 14-year-old young girl in the ninth grade. She is currently enrolled in Frontier High School in Bakersfield, California. M.C. has multiple disabilities, including Lennox-Gastaut Syndrome, a rare but severe form of epilepsy. These diagnoses mean that M.C. has multiple types of seizures on a daily basis. These seizures can have mild effects, or they can be strong and life-threatening, involving loss of consciousness and/or loss of memory, and take time to recover from. M.C. requires continuous supervision and, when needed, precise administration of emergency seizure medication. M.C. also has a VNS surgically implanted to assist with seizure control. She also uses a service dog, including while at school.

12.  At all times applicable to this action, M.C. is and has been a qualified individual with a disability within the meaning of all applicable statutes including the Americans with Disabilities Act, Section 504, and California Government Code § 12926. M.C.'s medical conditions substantially limit several major life activities,

1    including but not limited to, walking, speaking, and caring for herself.

2        13. M.C., at all times relevant to this action, received special education

3    services.[8]

4        14. Presently, and at all times relevant to this action, M.C. was and is a resident

5    of Bakersfield, Kern County, California.

6        15. Presently, and at all times relevant to this action, M.C. was a student at

7    Frontier High School within the school district boundary of Kern High School

8    District.

9        ***Defendants***

10        ***Kern High School District***

11        16. Kern High School District (the "District") is a public school district

12    organized and existing under the laws of the State of California, with the capacity to

13    sue and be sued. The District is located in Kern County, California.

14        17. Presently, and at all times relevant to this action, the District was and is a

15    public entity within the meaning of Title II of the ADA.

16        18. Presently, and at all times relevant to this action, the District was and is a

17    recipient of federal funding within the meaning of  the Rehabilitation Act.

18        19. Presently, and at all times relevant to this action, the District was and is a

19    political subdivision of the State of California and received funding and direction

20    from the State of California within the meaning of Government Code Section

21    11135.

22        20. The District is the owner, operator, or lessor/lessee of Frontier High School.

23    It is responsible for promulgating policies and procedures concerning the use of the

24    facilities at Frontier High School.

25

26    _____

[8]  Through this complaint, M.C. does not challenge the adequacy of her Individualized Education

27    Program ("IEP") or allege Defendants violated the Individuals with Disabilities Education Act
("IDEA"). All references to her IEP, or IEP team meetings herein are for background purposes,

28    e.g. establish Defendants' knowledge of her disabilities and history of accommodations and/or
lack thereof.

21. The District is sued in its own right and on the basis of the acts of its officials, agents and employees. Under law, including California Government Code § 815(a), the District is liable for the unlawful tortious acts hereinafter complained of, including those violating state law and committed by any District entity or employee acting within the course and scope of their employment.

22. The District is responsible for accommodating the disabilities of students enrolled in its schools and ensuring that its employees comply with the ADA and Section 504. At all times relevant to this action, the District was and is the local education agency responsible for providing M.C. with full and equal access to its public education programs and activities in compliance with the requirements of state and federal law.

### *Dr. Michael Zulfa as Superintendent of the District*

23. Dr. Michael Zulfa is the Superintendent of the District. As Superintendent, Dr. Zulfa has authority, oversight, and control of the District's schools and facilities, including the policies, practices, procedures, facilities, maintenance, programs, activities, services and employees of said schools and facilities. Dr. Zulfa is responsible for ensuring that District schools and facilities comply with the ADA, Section 504, and state law. Dr. Zulfa is sued in his official capacity.

### ***Does 1-10***

24. The true names and capacities, whether individual, corporate, associate, or otherwise of Does 1 through 10, inclusive, are unknown to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff is informed and believes and therefore alleges that each of the defendants designated as a Doe is legally responsible in some manner for the events and happenings referred to herein, and legally caused injury and damages proximately thereby to Plaintiff as herein alleged. Plaintiff will seek leave to amend the Complaint when the true names, capacities, connections, and responsibilities of Does 1 through 10, inclusive are ascertained.

### *Defendants Generally*

25. Plaintiff is informed and believes that each of the Defendants is the agent, ostensible agent, alter ego, master, servant, trustor, trustee, employer, employee, representative, franchiser, franchisee, lessor, lessee, joint venturer, parent, subsidiary, affiliate, related entity, partner and/or associate, or such similar capacity of each of the other Defendants, and was at all times acting and performing, or failing to act or perform, within the course and scope of such similar aforementioned capacities, and with the authorization, consent, permission or ratification of each of the other Defendants, and is personally responsible in some manner for the acts and omissions of the other Defendants in proximately causing the violations and damages complained of herein, and have participated, directed, and have ostensibly and/or directly approved or ratified each of the acts or omissions of each of the other Defendants, as herein described.

26. Hereafter, references to "Defendants" shall include Paragraphs 16-25.

## COMPLIANCE WITH GOVERNMENT CLAIM REQUIREMENTS

### (With regard to claims for damages under California state law)

27. On August 29, 2024, M.C. filed an administrative claim with the District regarding her damages, pursuant to California Government Code §§ 910, *et seq*. The claim included a detailed description of the allegedly unlawful conduct and a demand that the District stop the ongoing unlawful practices and continuing violation of the law. On October 14, 2024, the District rejected Plaintiff's claim by way of letter. Plaintiff has thus complied with the requirements of Government Code Section 910 *et seq*.

## FACTS APPLICABLE TO ALL CLAIMS

28. M.C. is a courageous and kind 14-year-old ninth grader at Frontier High School within the District. She has multiple disabilities, including Lennox-Gastaut Syndrome, a rare but severe form of epilepsy. These diagnoses mean that M.C. experiences multiple types of seizures and on a daily basis. She experiences both

tonic[9] and tonic-clonic[10] seizures as well as focal[11] and myoclonic seizures[12], among others. As a result of her disabilities, M.C. has been prescribed daily medication that works to prevent seizures as well as two rescue antiseizure medications[13]; Valtoco, that must be administered if her seizure last more than five minutes, and Ativan that must be administered if she experiences a cluster of more than 10 seizures in an hour. Unlike the daily prescribed medication that helps prevent seizures, rescue medications work quickly to stop an active seizure. M.C. also has a VNS surgically implanted in the upper left side of her chest to assist with seizure control. The VNS is the first intervention to be used to stop an ongoing seizure. Use of the VNS may prevent or lessen seizures, thereby avoiding the need for rescue medication. M.C. also uses a seizure response service dog, including at school.

29. M.C.'s frequent seizures put her at risk of a fatal complication known as Sudden Unexpected Death in Epilepsy ("SUDEP").[14] Managing her seizures

---

[9] In a tonic seizure, the tone is greatly increased: the body, arms, or legs become suddenly stiff or tense. Epilepsy Foundation, *Tonic Seizure*, https://www.epilepsy.com/what-is-epilepsy/seizure-types/tonic-seizures (last visited on April 14, 2025).

[10] In a tonic-clonic seizure, muscles stiffen followed by rhythmic jerking of the arms and usually the legs. Epilepsy Foundation, *Tonic-Clonic Seizures*, https://www.epilepsy.com/what-is-epilepsy/seizure-types/tonic-clonic-seizures#What-is-a-tonic-clonic-seizure? (last visited on April 14, 2025).

[11] When people have focal aware seizures, they are fully awake, alert, and able to recall events during the seizure. Overall, these seizures are brief, usually lasting less than 2 minutes. Epilepsy Foundation, *Focal Awareness Seizures (Simple Partial Seizures)*, https://www.epilepsy.com/what-is-epilepsy/seizure-types/focal-onset-aware-seizures#What-is-a-focal-aware-seizure? (last visited on April 14, 2025).

[12] Myoclonic seizures are brief, shock-like jerks of a muscle or a group of muscles. Usually, they don't last more than a second or two. There can be just one, but sometimes many will occur within a short time. Epilepsy Foundation, *Myoclonic* Seizures, https://www.epilepsy.com/what-is-epilepsy/seizure-types/myoclonic-seizures (last visited April 14, 2025).

[13] Epilepsy Foundation, *Seizure Rescue* Therapies, https://www.epilepsy.com/treatment/seizure-rescue-therapies#:~:text=In%20a%20hospital%20setting%2C%20other,clonazepam%2C%20clorazepate%2C%20and%20midazolam. (last visited on April 14, 2025).

[14] Epilepsy Foundation, *SUDEP*, https://www.epilepsy.com/complications-risks/early-death-sudep (last visited on April 14, 2025).

through proper medication administration, use of the VNS, and avoidance of environmental triggers is vital to lessening the risk of SUDEP.[15]

30. On or about April 2024 and in anticipation of M.C. moving into ninth grade, Mrs. Cavazos contacted Frontier High School, requesting to speak to school staff about M.C.'s disabilities and need for appropriate accommodations. Mrs. Cavazos eventually spoke with Ms. Baldoni (hereinafter "Ms. Baldoni" or "Nurse Baldoni), school nurse at Frontier High School. During their initial conversation, in response to Mrs. Cavazos informing Ms. Baldoni that M.C. was prescribed Ativan for a rescue medication, Ms. Baldoni told Mrs. Cavazos that Ativan in the form that M.C. was prescribed by her doctor had not been approved by the Food and Drug Administration (FDA), i.e., it was an off-label use prescription.[16] Mrs. Cavazos, among other things, explained that M.C.'s accommodations were critical to keeping her safe while at school and that, over the years and in partnership with M.C.'s doctor, a pediatric neurologist at UCLA Mattel Children's Hospital, they had tried treating M.C.'s many types of seizures with several different drugs and doses. Her current prescription, which includes the use of Ativan, had so far proven to be the most successful at treating the various types of seizures that M.C. experiences. She further explained that M.C.'s prior school within the Standard School District had administered M.C.'s medication at school without issue. In subsequent conversations, rather than offer a plan to appropriately accommodate M.C., Ms. Baldoni suggested to Mrs. Cavazos that she contact M.C.'s doctor and request that he change M.C.'s prescription to accommodate the District's policies, medications

---

[15] *Id*.

[16] Off-label drug use involves prescribing medications for indications, or using a dosage or dosage form, that have not been approved by the US Food and Drug Administration. "From the FDA perspective, once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient." U.S. Food and Drug Administration, *Understanding Unapproved Use of Approved Drugs "Off Label"*, https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label (last visited April 14, 2025).

1    that M.C. had been successfully using for at least seven years, including at her

2    previous school without any incident.

3        31. In May 2024, Ms. Baldoni emailed Mrs. Cavazos documents regarding the

4    use of Ativan which included portions of the California Education Code regarding

5    the administration of antiseizure medication at school and a print out from the

6    Epilepsy Foundation website, with a list of FDA approved antiseizure medication

7    highlighted by Ms. Baldoni. Mrs. Cavazos understood this to be further pressure

8    from Ms. Baldoni to change M.C.'s prescription.

9        32. Prior to school starting, the District required Mrs. Cavazos to complete

10    various forms, including two Authorization For Medication Taken During School

11    Hours Form ("Release and Indemnification Form") for the Valtoco and Ativan

12    medications respectively. The District's Release and Indemnification Form required

13    Mrs. Cavazos to agree, *inter alia*, that "We understand that the school is not legally

14    obligated to administer medication to any child and therefore agree to hold the

15    school district and its employees harmless from any and all liability for the results

16    of such medication or the manner in which it is administered, and to indemnify the

17    school district and its employees for any liability arising out of this agreement."

18    Mrs. Cavazos was required to sign the Authorization Form, a one-sided contract of

19    adhesion, in order for the school to administer Valtoco and Ativan to M.C.

20    Believing M.C.'s ability to attend school was contingent on her signing, Mrs.

21    Cavazos signed the Release and Indemnification Forms. However, even with the

22    signed form, the District continued to refuse to administer the Ativan.

23        33. On or about June 3, 2024, Ms. Cavazos submitted to Ms. Baldoni, two

24    Release and Indemnification Forms, one for Valtoco and one for Ativan. Mrs.

25    Cavazos signed the Release and Indemnification Forms because she believed

26    M.C.'s ability to attend school safely was contingent on her signing.

27        34. Subsequently, Mrs. Cavazos had several additional conversations with Nurse

28    Baldoni regarding M.C.'s disability-related accommodations, including her rescue

1    medication. Nurse Baldoni informed her that M.C. would not be allowed to carry

2    Valtco, the other rescue seizure medication on her person, although she had

3    permitted to do so at her previous school without issue. M.C. would also not be

4    allowed to carry her seizure medication on the bus; Mrs. Cavazos was told that, if

5    M.C. were to have a seizure requiring emergency medication while on the bus, that

6    she would have to wait for emergency paramedics to respond to the bus's location.

7        35. On or about June 20, 2024, concerned with the responses she got from Nurse

8    Baldoni, Mrs. Cavazos reached out to Scott Odlin, then Director II Instruction at the

9    District, about her daughter's disability-related needs. Mr. Odlin informed Ms.

10   Cavazos that the District would not administer Ativan to M.C. because it was not

11   FDA approved. Mrs. Cavazos objected, again sharing as she had with Ms. Baldoni

12   her concern that M.C. would not be safe at school without her prescribed

13   medication and that her previous school had administered the Ativan without issue.

14   Shortly thereafter, Mr. Odlin sent a letter dated June 20, 2024 memorializing the

15   fact that they had spoken and referencing California Education Code Section

16   49468.2 as support for the District's position that in order for the District to

17   administer M.C.'s medication must be FDA approved.

18       36. Having been repeatedly told by the District that it would not administer one

19   of M.C.'s lifesaving medications and increasingly concerned that M.C. would not

20   be able to attend school safely, Mrs. Cavazos sought the assistance of counsel. On

21   August 6, 2024, counsel on behalf of Mrs. Cavazos sent the District a letter

22   requesting a meeting of appropriate District personnel to appropriately

23   accommodate her disabilities, one way being to craft a comprehensive health plan

24   that would ensure M.C. be able to safely attend school with her peers and enjoy all

25   of the same educational and social opportunities. Ignoring the request for a meeting

26   to specifically discuss M.C.'s need for accommodations, the District instead

27   responded by offering to hold an IEP meeting.

28       37. On August 8, 2024, M.C. and her mother attended orientation day at Frontier

---

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

High School. During orientation, Ms. Cavazos again spoke with Nurse Baldoni about M.C.'s disability needs, including medication administration. No meaningful plan was offered to address M.C.'s needs.

38. Rather than respond to Ms. Cavazos's earlier request for a meeting to address M.C.'s disability and disability-related medication needs, the District held an IEP meeting on August 13, 2024, the day before school started. A health plan was discussed during the IEP meeting. However, despite Ms. Cavazos providing doctor's orders, which included the administration of Ativan at school, the District refused to include that in the health plan it developed. The District claimed that the administration of Ativan, as prescribed off-label, was unlawful and not safe for administration in the school setting. Defendants told Mrs. Cavazos that it would notify parent at the onset of focal seizure, the type which required Ativan, but that if parents wanted Ativan to be administered, they would have to come to school and do it themselves. Left with no alternative, Mrs. Cavazos proposed a cobbled-together plan by which she would be notified once a seizure started so that she, M.C.'s father, and/or a family friend could get to school as quickly as possible to administer the Ativan. The District agreed that it would store the Ativan on campus and designated a specific campus gate at which staff would meet the person administering Ativan to allow them in.

39. Unlike with Ativan, the District had no objection to administering Valtoco, M.C.'s other prescribed rescue medication. However, it did not agree to permit M.C. to carry her medication on her person. She also would not be allowed to carry her seizure medication on the bus. Mrs. Cavazos was told that the transportation division has policy of not administering or carrying emergency medication. And that if M.C. needs emergency medication while on the bus, she will have to wait for emergency paramedics to respond to the bus's location. Mrs. Cavazos strongly disagreed, expressing concern that paramedics could take several minutes to arrive, thereby arriving too late and placing M.C. in grave danger. The District held firm

on its position.

40. Also at the August 13, 2024 IEP meeting, the District told Mrs. Cavazos that despite doctor's orders indicating that 911 should be called only if the rescue medication did not stop the seizure, it was District policy to call 911, as well as the parents, *every* time emergency medication was administered and that M.C. would need to go home. Mrs. Cavazos objected, explaining that historically Valtoco had been given to M.C. at school once or twice a month and that given some time and a quiet space to recover, M.C. was able to safely return to class. Concerned with M.C. losing instructional time as well as time interacting with her peers, Mrs. Cavazos wanted M.C. to be allowed to return to class. The District insisted that its policy required they call 911 and that, if she did not go to the hospital with emergency personnel, her parents had to take her home.

41.Despite M.C.'s disabilities, Mrs. Cavazos strives to give M.C. as typical a school-life as possible. M.C. was excited to start high school and would be devastated at not going as it would make her feel less than or different than other peers. Mrs. Cavazos felt that she had no choice but to agree to the health plan or face M.C. being denied from attending school; Mrs. Cavazos agreed to the District's plan.

42.As discussed more fully below, over the next few months M.C. would experience at least 10 focal seizures for which the District administered Valtoco.

43. M.C. also would experience at least two clusters of seizures that required the administration of Ativan. Each time, the District staff called M.C.'s mother and/or father who then rushed to school to administer the Ativan in time. Fortunately, both times parents arrived in time to administer the Ativan and M.C., after a short period of recovery, was able to return to class.

44. One such instance occurred on or about August or September 2024. At approximately 10AM, Mrs. Cavazos received a call from Nurse Baldoni informing her that they believed M.C. was experiencing a focal seizure. Ms. Cavazos could

hear M.C. crying in the background. Hoping to end the seizure without the need for medication, Ms. Cavazos encouraged staff to use the VNS magnet. Upon information and belief, the District staff was reluctant to use the VNS magnet. The seizure ended and no rescue medication was needed.

45. Upon information and belief, M.C. experienced a second focal seizure that same day at approximately 3PM. Nurse Baldini again called Ms. Cavazos and this time directed her to come to campus. When Mrs. Cavazos arrived to M.C.'s classroom, she found M.C. lying on the floor with a blanket; the seizure had ended. Present in the room was Nurse Baldini and other staff. Out of an abundance of caution, Mrs. Cavazos administered Ativan to M.C. Mrs. Cavazos then stayed with M.C. for approximately 20 minutes to observe her and ensure that she was okay. The District did not call 911.

46. After receiving rescue medication, M.C. needs a short period to rest and recover but is typically able to return to class. As such, if she recovers and feels well, it is critical for M.C. to stay at school so as to meaningfully participate in both school and afterschool activities, allows her to remain integrated among her non-disabled peers, and avoids her feeling less than or different than her peers. In this instance, M.C. recovered from her seizure at approximately 3:20PM, just before school ended and in time to go on to attend her daily afterschool program at as she normally would.

47. At approximately 3:20PM M.C., along with another classmate, boarded the school bus to be taken to the Lighthouse B.E.S.T program (Behavioral Education & Social skills Training) ("Lighthouse") an after school program house that works with students with disabilities.[17] Per District policy, M.C. was not allowed to carry her rescue medication on the bus nor was staff permitted to administer or carry her rescue medication for her. When M.C. didn't arrive to Lighthouse at the expected

---

[17] https://lifehousechristianacademy.com/best (last visited April 14, 2025).

time, staff called to inform Mrs. Cavazos. Ms. Cavazos attempted to call District staff to find out why the bus was delayed but was unable to reach anyone. M.C. eventually arrived to the afterschool program 30 minutes later than her typical drop-off time. On the next occasion that Mrs. Cavazos had to speak to Lighthouse staff, she was told that M.C.'s classmate, who had been on the bus with her that day, had reported to them that M.C. had a "big seizure" or words to that effect. To date, Mrs. Cavazos has never been told why the bus was delayed. Upon information and belief, Mrs. Cavazos believes M.C. experienced a seizure while on the bus, that the bus driver pulled over, likely contacted the school and then, after M.C. recovered, continued on to deliver M.C. and her classmate to Lighthouse.

48. Throughout this time, Mrs. Cavazos continued to work with Nurse Baldoni and school staff, including answering questions regarding M.C.'s seizures, and otherwise inform staff on how to better recognize and respond to M.C.'s seizures and other disability-related needs.

49. Meanwhile, the District continued to refuse to address M.C.'s health plan and disability-related accommodations in the form of her ADA reasonable accommodation request. Instead, it held an IEP meeting on August 29, 2024, to discuss M.C.'s seizure and disability-related behavior . Rather than address M.C.'s disability-related accommodations, the District insisted on conducting a behavior assessment under the IDEA, which subsequently found there was no pattern to M.C.'s seizures. This was not surprising as Mrs. Cavazos had already informed the school that no such pattern existed. Also during that meeting Mrs. Cavazos asked about the reason for the bus delay discussed *supra* but the District staff had no information.

50. On or about September 2024, during an IEP meeting, and after refusing to accommodate M.C.'s need for an accommodation under the ADA and Section 504, the District assigned M.C. a full-time nurse who would be responsible for administering all of her prescribed rescue medications, including Ativan, at school.

However, Defendants initially conditioned their administration of Ativan on Mrs. Cavazos signing yet another release of liability and indemnification form, "Parent/Guardian Medication Administration In School", which states "The District believes that, ordinarily, off-label use of medications such as Ativan cannot be administered by school personnel." It further required Mrs. Cavazos to agree, *inter alia*, "to indemnify, defend, hold harmless and release from liability the Kern High School District, its officers, agents, and employees, for any injury, illness, death, damages, claims, or loss whatsoever that may occur as a result of, or in connection with, the administration of medication to Student by trained school staff while at the school site or during school activities, and the actions and/or omissions of any trained school staff to administer and/or assist in administering the medication described above to Student in accordance with the physician's direction." Having grown increasingly concerned over the District's response to M.C.'s disability needs and, among other things, worried about the potential financial implications of such a waiver, Ms. Cavazos did not sign the form. Although Mrs. Cavazos did not sign, the District, without explanation, moved forward with assigning M.C. a nurse who now administers her emergency medication as needed, including the Ativan. The District has refused to explain whether its decision to now agree to administer Ativan is a change in policy.

51. The District also failed, and continues to fail, to comply with M.C.'s doctor's orders, which requires school staff to call 911 if, after administering her rescue medication, the seizure continues uncontrolled. Instead, the District asserts that District policy requires them to call 911, as well as a parent, after administering rescue medication in *all* circumstances. This means that, M.C.'s unless M.C.'s parents arrive at school before and/or shortly after the emergency personnel in order to refuse transport to the hospital, M.C. risked being taken to the hospital via ambulance to be evaluated unnecessarily and against her will, which, among other things, causes M.C. distress, embarrassment and results in an unnecessary and

preventable loss of instructional time and repeated disruptions to her education. Moreover, even if M.C.'s parents are successful in avoiding a trip to the emergency room, the District insists that M.C. go home in *all* circumstances after administering rescue medication which, among other things, results in preventable loss of instructional time and disruptions to her education. This means that even if after emergency personnel have evaluated M.C., declared her vital signs are fine, and left her in her parents' care, and M.C.'s parents and M.C. herself say that she has recovered and wants to return to school, she cannot. The District has also been inconsistent with its own stated policy – at times calling 911 immediately following the administration of emergency medication and other times not calling 911 at all.

52. For example, in October 2024, M.C. experienced at least ten incidents of focal seizures that required the District to restrain M.C. as well as administer Valtoco. Each time, the District called 911 as well as M.C.'s parents. Each time, either Mrs. or Mr. Cavazos would rush to the school to meet the paramedics. Paramedics would assess M.C. and, each time, they found her vitals to be fine. M.C.'s parents would subsequently inform the paramedics that it was not necessary to take M.C. to the hospital. Per District policy, M.C. was not allowed to return to class after emergency medication was administered, even if she had recovered and wanted to stay and despite her parents repeated pleas that she be allowed to stay. Each time, the District forced M.C. to go home and wrongly shortened her school day short, which resulted in, *inter alia*, lost instructional time, social opportunities and an unequal school day.

53. The District has failed and continues to fail to address M.C.'s disability-related needs and accommodations, including by: not properly training staff on use of the VNS; initial refusal to administer Ativan; not allowing M.C. to carry Valtoco on her person, requiring parents to sign a contract of adhesion agreeing to indemnify the District as a condition to allowing M.C. to attend school; initially not allowing M.C. to carry her rescue medication on the bus nor permitting staff to

administer or carry her rescue medication for her; failing to provide an accommodation to the District's 911 policy that, when implemented, denies M.C. meaningful access to her educational program. M.C. wants to attend school, be included in school activities, and treated equally to her non-disabled peers. M.C.'s parents remain fearful that the District could reverse course on its current agreement to administer Ativan. The District also continues to require M.C.'s parents to sign Release and Indemnification Forms agreeing that the District is not legally obligated to administer medication and further agreeing to waive liability for all future harm arising out of the school's administration of medication and to indemnify the District.

### INJURY TO PLAINTIFF

54. As the result of Defendants' acts and omissions, and the acts and omissions of its representatives and agents as herein described, Plaintiff was and will continue to be denied full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations provided by Defendants and has suffered a loss of her civil rights and physical and emotional harm. The ongoing nature of Defendants' discrimination constitutes an ongoing violation and, unless enjoined by this Court, will result in ongoing and irreparable injury. The above failings ensure unequal access to Defendants' services, programs, and activities and deny her the opportunity to participate in and benefit from educational services that is equal to that afforded to other students. Defendants' acts and omissions described above also impose a contract of adhesion on M.C.'s parents as well as a surcharge by requiring parents agree to indemnify the District in order for M.C. to attend school and not be segregated from her peers. Defendants' further utilize methods of administration that have a discriminatory impact on M.C. This discrimination has a dramatic impact on Plaintiff.

//

//

1

## RIGHT TO INJUNCTIVE RELIEF AND DECLARATORY RELIEF

2

3    55. Unless enjoined, Defendants will continue to engage in the unlawful acts

4    and pattern and practice of discrimination described above. Plaintiff has no

5    adequate remedy at law. Accordingly, Plaintiff is entitled to injunctive relief.

6    An actual controversy has arisen and now exists between the parties concerning

7    their respective rights, duties, and obligations under federal and state law.

8    Accordingly, Plaintiff is entitled to declaratory relief.

## FIRST CLAIM FOR RELIEF

9

### The Americans with Disabilities Act

10

### 42 U.S.C. §12132 *et seq.*

11

### (By M.C. Against All Defendants)

12    56. Plaintiff incorporates by reference the above paragraphs as though fully set

13    forth herein.

14    57. Congress enacted the ADA to "to provide a clear and comprehensive

15    national mandate for the elimination of discrimination against individuals with

16    disabilities" and "clear, strong, consistent, enforceable standards addressing

17    discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

18    58. Title II of the ADA provides that "no qualified individual with a disability

19    shall, by reason of such disability, be excluded from participation in or be denied

20    the benefits of the services, programs, or activities of a public entity, or be

21    subjected to discrimination by any such entity." 42 U.S.C. § 12132.

22    59. Presently, and at all times relevant to this action, the District was and is a

23    public entity within the meaning of Title II of the ADA.

24    60. M.C. is an individual with a disability under the ADA. 42 U.S.C. § 12102.

25    Her disabilities substantially limit one or more major life activities, including but

26    not limited neurological functions during a seizure.

27    61. As a school-age child who lives in the District, she is qualified to participate

28    in Defendants' educational programs and services. 42 U.S.C. § 12131(2).

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

62. Defendant District is a public entity within the meaning of the ADA. Defendant Superintendent Zulfa is the official responsible for running and/or supervising the operations of the District.  42 U.S.C. § 12131(1).

63.  Through the acts and omissions described above, Defendants are violating the ADA, 42 U.S.C. § 12132, and its implementing regulations, 28 C.F.R. Pt. 35, including by:

    a. Discriminating against Plaintiff on the basis of her disabilities 42 U.S.C. §12132, 28 C.F.R. §35.139(a));

    b. Failing to make reasonable modifications to policies, practices, and procedures to avoid discrimination against M.C. (28 C.F.R. §35.130(b)(7));

    c. Utilizing methods of administration that have the effect of having a discriminatory effect on people with disabilities including utilizing  a contract of adhesion which makes the provision of prescribed medication to M.C. contingent on an agreement to indemnify Defendants from liability (28 C.F.R. §35.130(b)(3), 28 C.F.R. § 35.130 (b)(l)(i),(ii),(iii) and (vii); see also 28 C.F.R. § 41.51 (b)(3)(i));

    d. Imposing a surcharge on Plaintiff to cover the costs of measures that are required to provide that individual or group with nondiscriminatory treatment, such as the contract of adhesion which makes the provision of prescribed medication to M.C. contingent on an agreement to indemnify Defendants from liability;

    e. Denying M.C. an opportunity to participate in and benefit from educational services that is equal to that afforded of other students (28 C.F.R. §35.130(b)(1)(ii));

    f. Denying M.C. the opportunity to participate in or benefit from the aids, benefits, or services offered by Defendants to students at Frontier High School (28 C.F.R. § 35.130(b)(l)(i));

g.  Providing M.C. with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others (28 C.F.R. § 35.130(b)(1)(iii));

h.  Providing different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities that is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others (28 C.F.R. § 35.130(b)(l)(iv));

i.  Otherwise limiting Plaintiff in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aids, benefits, or services offered by Defendants to students at Frontier High School (28 C.F.R. § 35.130(b)(l)(vii));

j.  Failing to provide equal access to a safe and secure educational program;

k.  Making the provision of prescribed medication to M.C. contingent on an agreement to indemnify Defendants from liability.

64. Defendants at all times have known or should have known that M.C. was a student with disabilities and required reasonable modifications.

65. Defendants committed the acts and omissions alleged herein with intent and/or deliberate indifference to M.C. rights. Defendants have further demonstrated a deliberate indifference that harm to Plaintiff's federally protected rights under the ADA was substantially likely, and failed to act upon that likelihood

66. The acts and omissions of Defendants have caused and will continue to cause M.C. to suffer irreparable harm, and she has no adequate remedy at law.

67. Further, as a direct and proximate result of Defendants aforementioned acts and omissions, M.C. has suffered injury as alleged herein, including but not limited to, denial of the benefits of a public education. Moreover, as direct and proximate

result of the foregoing, M.C. has suffered, and continues to suffer, among other things, emotional harm, humiliation, hardship and anxiety, loss of her civil rights, and the loss of equal educational opportunities solely on the basis of her disability.

68. Pursuant to 42 U.S.C. §§ 12133 and 12205, Plaintiff seeks declaratory relief, injunctive relief, damages, and attorneys' fees and costs as appropriate and permitted by law.

## SECOND CLAIM FOR RELIEF

### Section 504 of the Rehabilitation Act

### 29 U.S.C. § 794 *et seq.*

### (By M.C. Against All Defendants)

69. Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

70. Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States...shall, solely by reason of [their] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

71. Plaintiff M.C. is a qualified individual with a disability under Section 504.

72. Defendants are recipients of federal funds.

73. Solely by reason of her disabilities, M.C. has been excluded from participation in, denied the benefit of, and subjected to discrimination in her attempts to receive meaningful and equal access to the facilities, programs, services, and activities offered by Defendants in violation of Section 504, 29 U.S.C. § 794, *et seq.*, and its implementing regulations at 34 C.F.R. Pt. 104 (U.S. Department of Education) and 28 C.F.R. 42.501 *et seq.* (U.S. Department of Justice). The Defendants' acts and omissions violating M.C.'s rights under the ADA also violate her rights under Section 504 (*see* First Claim for Relief, *supra*). //

74. Defendants committed the acts and omissions alleged herein with intent and/or deliberate indifference to M.C.'s rights. Defendants have further demonstrated a deliberate indifference that harm to Plaintiffs' federally protected rights under Section 504 was substantially likely, and failed to act upon that likelihood.

75. Defendants at all times have known or should have known that M.C. was a student with disabilities and required modifications.

76. The acts and omissions of Defendants have caused and will continue to cause M.C. to suffer irreparable harm, and she has no adequate remedy at law.

77. Further, as a direct and proximate result of Defendants aforementioned acts and omissions, M.C. has suffered injury as alleged herein, including but not limited to, denial of the benefits of a public education. Moreover, as direct and proximate result of the foregoing, M.C. has suffered, and continues to suffer, among other things, emotional harm, humiliation, hardship and anxiety, loss of her civil rights, and the loss of equal educational opportunities solely on the basis of her disability.

78. Pursuant to 29 U.S.C. § 794(a), Plaintiff seeks declaratory and injunctive relief, damages, and reasonable attorneys' fees and costs incurred in bringing this action as appropriate and permitted by law.

### THIRD CLAIM FOR RELIEF

### California Government Code § 11135 *et seq.*

### (By M.C. Against All Defendants)

79. Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

80. California Government Code § 11135 prohibits discrimination under, and the denial of full and equal access to the benefits of, state-funded programs and activities on the basis of disability.

81. At all times relevant to this action, Plaintiff M.C. has been and is a qualified individual with a disability within the meaning of California law. Cal. Gov't Code §

12926.

82. Defendant District is a public agency that receives financial assistance from the State of California. Defendant Zulfa is an official responsible for running and/or supervising the operations of the District.

83.  Through the acts and omissions described above, Defendants' discriminatory policies and practices deny Plaintiff full and equal access to the services, programs, and activities offered by Defendants to students at Frontier High School in violation of Government Code § 11135, and its implementing regulations. Defendants discriminate against M.C., *inter alia*, by enforcing facially neutral policies by calling 911 after the administration of emergency medication and prohibiting M.C. from returning to class and by making her ability to attend school contingent on an agreement to indemnify the District for its administration of medication.

84. Defendants have also violated Government Code § 11135(b) in that the conduct alleged herein constitutes a violation of the ADA. (*see* First Claim for Relief, *supra*).

85. Defendant's actions have caused and will continue to cause M.C. to suffer irreparable harm, and she has no adequate remedy at law. Because Defendant's discriminatory conduct is ongoing, declaratory and injunctive relief are appropriate remedies. M.C. is also entitled to reasonable attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF

### Contract Law / California Civil Code §§ 1668 and 3513

### (By M.C. Against All Defendants)

86. Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

87. The Release and Indemnification Form and Parent/Guardian Medication Administration In School Form are unconscionable. *Armendariz v. Found Health Psychcare Services Inc*., 24 Cal.4th 83 (2000); *Mercurio v. Superior Court*, 96

1  Cal.App.4th 167, 174-175 (2009).

2  88. Defendants' Release and Indemnification Form and Parent/Guardian

3  Medication Administration In Schools Form are procedurally unconscionable

4  because Defendants use oppression. Mrs. Cavazos was and is in a significantly

5  weaker bargaining position that Defendants. She was further provided with a pre-

6  drafted "take it or leave it" contract of adhesion.

7  89. Defendants' contract is, among other things, substantively unconscionable

8  because its terms are one-sided and overly harsh for Plaintiff. Plaintiff is effectively

9  only allowed to attend school and receive life-saving medication if she agrees to

10  release and indemnify Defendants for their provision of a disability

11  accommodation.

12  90. Defendants' Release and Indemnification Form and Parent/Guardian

13  Medication Administration In Schools Form are void an unenforceable because

14  they contain a waiver of substantive rights that cannot be waived. *Bickel v. City of*

15  *Piedmont*, 16 Ca.4th 1040, 1048-1049 (1997). *In re Marriage of Fell*, 55

16  Cal.App.4th 1058, 1065 (1997). Agreements whose object, directly or indirectly, is

17  to exempt parties from violation of the law are against public policy and may not be

18  enforced. California Civil Code Section 1668; *In re Marriage of Fell*, 55

19  Cal.App.4th 1058, 1065 (1997).

20  91. A law established for a public reason cannot be contravened by a private

21  agreement. Civil Code Section 3513; *In re Marriage of Fell*, 55 Cal.App.4th 1058,

22  1065 (1997); *Armendariz v. Found. Health Psychcare Servs. Inc*., 24 Cal.4th 83

23  (2000).

24  92.Congress enacted the ADA upon finding, among other things, that "society

25  has tended to isolate and segregate individuals with disabilities" and that such

26  forms of discrimination continue to be a "serious and pervasive social problem." 42

27  U.S.C. § 12101(a)(2).

28  //

---

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF
25

93. In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §12101(b).

94. In enacting Section 504 of Rehabilitation Act of 1973, Congress  found that disability is a natural part of the human experience and in no way diminishes the right of individuals to enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society. 29 U.S.C. § 701(a)(3).

95. Education is a fundamental right under the California Constitution. Article IX, Section 1 of the California Constitution recognizes that "[a] general diffusion of knowledge and intelligence [is] . . . essential to the preservation of the rights and liberties of the people . . ." Cal. Const. art. IX, § 1.

96. Further, The equal protection clauses of the California Constitution, Article I, Section 7(a) and Article IV, Section 16(a), bar the State from maintaining the public school system in a manner that denies some students the basic educational necessities provided to other students. Cal. Const. art. I, § 7(a) and art. IV, §16(a).

97.  The California Constitution makes public education uniquely a fundamental concern of the State and prohibits maintenance and operation of the common public school system in a way which denies basic educational equality to the students. *Butt v. State of California*, 4 Cal. 4th 668, 685, (1992)

98. The statement that "the school is not legally obligated to administer medication to any child" and requirement to indemnify the District contained in Defendants' Release and Indemnification Form violates both sections 1668 and 3515 of the California Civil Code in that it precludes the vindication of Plaintiff's rights under the ADA, Section 504 and related state disability laws as well as the California Constitution which were enacted for the benefit of society as a whole. //

99. Because Defendants' Release and Indemnification Forms are both substantively and procedurally unconscionable, in violation of public policy, contracts of adhesion, and contrary to law, the Defendants' Release and Indemnification Form and Parent/Guardian Medication Administration In Schools are void and unenforceable.

## FIFTH CLAIM FOR RELIEF

### California Education Code § 200, 201, and 220

### (By M.C. Against All Defendants)

100.    Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

101.    California Education Code § 200 states in relevant part that "[i]t is the policy of the State of California to afford all persons in public schools, regardless of their disability …equal rights, and opportunities in the educational institutions of the state."

102.    California Education Code § 201(a) states in relevant part that "[a]ll pupils have the right to participate fully in the educational process, free from discrimination."

103.    California Education Code § 220 prohibits, *inter alia,* discrimination on the basis of disability "in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance or enrolls pupils who receive state student financial aid."

104.    At all times relevant to this action, Plaintiff was and is a qualified individual within the meaning of the California Education Code § 220 as defined by California Education Code Section 210.1.

105.    At all times relevant to this action, Defendant District received financial assistance from the State of California.

106.    As a direct and proximate result of Defendants actions or omissions as described herein, Defendants have violated California Education Code §§ 200, 201,

---

and 220, by denying Plaintiff the benefits of, and unlawfully subjecting Plaintiff to, discrimination under Defendants' services, programs, and activities. Unless enjoined, Defendants' conduct will continue to inflict injuries for which M.C. has no adequate remedy at law. Because Defendants' discriminatory conduct is ongoing, both declaratory and injunctive relief are appropriate. M.C. seeks declaratory and injunctive relief, damages, and reasonable attorneys' fees, costs of suit incurred herein as permitted by law.

## SIXTH CLAIM FOR RELIEF
### Violation of Mandatory Duty
### California Government Code § 815.6
### (By M.C. Against All Defendants)

107.     Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

108.     Government Code Section 815.6 provides for liability against a public entity when:

    a.  The entity violates a mandatory duty imposed by an enactment;

    b.  The Plaintiff is in the class of persons protected by the enactment;

    c.  The enactment is designed to protect from the kind of injury complained of by the plaintiff;

    d.  The violation proximately caused the injury; and

    e.  The public entity did not exercise reasonable diligence in discharging its duty established by the enactment.

109.     An enactment includes a federal or state constitutional provision, statute, charter provision, ordinance, or properly adopted regulation.

110.     The statutes cited throughout the various causes of action in this complaint are all enactments within the meaning of California Civil Code Section 815.6.

//

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

111.    Plaintiff was and is in the class of persons protected by these enactments.

112.    The aforementioned enactments constitute mandatory duties within the meaning of California Civil Code Section 815.6 and were designed to prevent the kind of injuries alleged herein.

113.    Defendants, as described in this Complaint, did not exercise reasonable diligence in discharging their duty established by the enactments enumerated above to refrain from violating the Plaintiff's constitutional and statutory rights.

114.    Because Defendants' discriminatory conduct is ongoing, equitable, declaratory, and injunctive relief are appropriate remedies.

115.    Plaintiff is entitled to reasonable attorneys' fees, costs of suit incurred herein, and such other and further relief as the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF

### Negligence and Negligence *Per Se*

### (By M.C. Against All Defendants)

116.    Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

117.    At all relevant times, Defendants owed a duty of care to Plaintiff.

118.    California Government Code Section 820 provides that a public employee is liable for injury caused by his act or omission to the same extent as a private person.

119.    California Government Code Section 815.2 provides that a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his or her employment.

120.    Defendants breached their duty of due care to Plaintiff by the acts and omissions alleged herein.

121.    By their acts and omissions as alleged herein, Defendants violated federal and state statutes and regulations, including but not limited to the ADA,

Section 504, and state statutes.

122.    Defendant District was at all relevant times the employer of the school personnel at issue who failed to ensure M.C. was provided accommodations and supports while at school. These employees committed the acts described herein while acting within their scope of their employment with the District.

123.    Pursuant to California Government Code Section 815.2, Defendants are vicariously liable for the actions of its employees acting within the scope of their employment.

124.    Defendants' violation of law and breach of duty proximately caused and were a substantial factor in causing harm to Plaintiff, including substantial emotional distress. Such damages were reasonably foreseeable to Defendants.

125.    Plaintiff's damages resulted from an occurrence the nature of which the violated statutes and regulations were designed to prevent.

126.    At all relevant times, Plaintiff belongs to the class of persons for whose protection the statutes and regulations were adopted.

127.    Plaintiff is entitled to damages according to proof, reasonable attorneys' fees, costs of suit incurred herein, and such other and further relief as the Court deems just and proper.

## EIGHTH CLAIM FOR RELIEF

### Negligent Supervision

### (By M.C. Against All Defendants)

128.    Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

129.    Defendants had a legal duty to exercise reasonable care in supervising "special needs" students in its charge pursuant to California Education Code Section 44807 and may be held liable for injuries proximately caused by the failure to exercise such care.

//

130.     Plaintiff is a "special needs" student who is particularly vulnerable and dependent upon the Defendants who, correspondingly, had control over Plaintiff's welfare.

131.     The Defendants breached their duties to Plaintiff when they failed to supervise Plaintiff and their employees while Plaintiff was on District grounds during the acts and omissions described herein and failed to ensure their teachers and classroom aides were adequately trained and provided proper supervision.

132.     Defendants were aware of the probably dangerous consequences of their conduct and willfully and deliberately failed to avoid those consequences. Defendants knew, or should have known, it was highly probably that harm would result from their actions described herein.

133.     California Government Code Section 815.2 provides that a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his or her employment.

134.     The District is vicariously liable for the actions of its employees acting within the scope of their employment.

135.     Plaintiff is entitled to damages according to proof, reasonable attorneys' fees, costs of suit incurred herein, and such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant the following relief:

1.   Order and declare that Defendants are violating the rights of Plaintiff M.C. under Title II of the ADA, Section 504, California Government Code § 11135, California Education Code §§200, 220, California Government Code 815.6 and the state common law torts pled herein;

2.   Declaring that California Education Code §49468 *et al*. does not prohibit Defendants from the administration of off-label use of prescribed anti-seizure medication;

3.  Declaring that the Release and Indemnification Form is void and unenforceable;

4.  Grant a permanent injunction pursuant to the ADA, Section 504 and Plaintiff's related state law claims ordering Defendants to adopt and implement non-discriminatory policies to ensure full and equal access to Defendants' services, programs and activities for students with disabilities, such as seizure disorders, including Plaintiff.

5.  Award Plaintiff compensatory, general, statutory, and special damages according to proof;

6.  Award Plaintiff's attorneys' fees and costs as appropriate and permitted by law; and

7.  Any other relief as this Court funds just and proper.


DATED: April 14, 2025                      **BARAJAS & RIVERA, APC**

_____

Maronel Barajas
Anna Rivera
Attorneys for Plaintiff

//
//

1

**DEMAND FOR JURY TRIAL**

2

3

M.C. demands a jury trial.

4

5

6

7   DATED: April 14, 2025                    **BARAJAS & RIVERA, APC**

8

9                                            _____

10                                           Maronel Barajas

11                                           Anna Rivera

12                                           Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

33